**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No.** _____

TALBOTT'S MOUNTAIN GOLD LLLP, a Colorado limited liability limited partnership;
TALBOTT LAND AND PROPERTY LLLP, a Colorado limited liability limited partnership;
BLAINE D PRODUCE COMPANY LLC, a Colorado limited liability company;
BOX ELDER RANCH, LLC, a Colorado limited liability company;
BOX ELDER RANCH, INC., a Colorado corporation;
MARC ARNUSCH FARMS LLC, a Colorado limited liability company; and
MAUCH FARMS, INC., a Colorado corporation,

      Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of Colorado;
JOSEPH M. BARELA, in his official capacity as Executive Director of the Colorado
Department of Labor and Employment; and
SCOTT MOSS, in his official capacity as Director of the Division of Labor Standards and
Statistics, Colorado Department of Labor and Employment,

      Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiffs, Talbott's Mountain Gold LLLP; Talbott Land and Property LLLP; Blaine D

Produce Company LLC; Box Elder Ranch, LLC; Box Elder Ranch, Inc.; Marc Arnusch Farms

LLC; and Mauch Farms, Inc., by and through undersigned counsel, hereby submit their

Complaint for Declaratory and Injunctive Relief as follows:

**JURISDICTION AND VENUE**

1.      The claims in this action arise under the Fifth Amendment to the United States

Constitution (the "Fifth Amendment"), which is made applicable to the States by the Fourteenth

Amendment.  This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983 and 28

U.S.C. § 1331.  Plaintiffs seek a remedy under 28 U.S.C. § 2201.

2.      State officials may be sued for declaratory and injunctive relief when their actions

violate the United States Constitution.  *See Ex Parte Young*, 209 U.S. 123 (1908).

3.      This Court has both subject matter and personal jurisdiction to enjoin the

Defendants from enforcing unconstitutional state legislation.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events

giving rise to this action occurred in this district, and the properties that are the subject of this

action are situated in this district.

## INTRODUCTION

5.      The Plaintiffs own and operate farms and ranches throughout the state of

Colorado, from the Eastern Plains to the Western Slope.

6.      Each Plaintiff is an "employer," as defined at C.R.S. § 8-13.5-103 (1), in that they

each are engaged in business and have one or more employees.

7.      Each Plaintiff is also an "agricultural employer," as defined at C.R.S. § 8-3-104

(1) (a), in that they each regularly engage the services of one or more employees, and they are

each engaged in services or activities recognized as "agriculture" under the federal Fair Labor

Standards Act. *See* 29 U.S.C. § 203 (f).

8.      Each Plaintiff engages in agriculture on property to which it controls access under

Colorado law, either through fee ownership or through present possession of a leasehold interest.

*See Robinson v. Legro*, 325 P.3d 1053, 1059 (Colo. 2014) (Hobbs, J., concurring) (leasehold

estate grants tenant exclusive right to possession including the right to exclude others); *Grynberg*

*v. Northglenn,* 739 P.2d 230, 236-37 (Colo. 1987) (holder of mineral lease entitled to assert claim of civil trespass separate from mineral and surface rights owners); *Plotkin v. Club Valencia Condominium Assoc.*, 717 P.2d 1027, 1028 (Colo. App. 1986) (trespass is entry upon real estate of another absent invitation or permission of person lawfully entitled to possession, whether landlord or tenant); CJI-Civ. 2d. 18:1 (2022) (elements of trespass include lawful possession of property); C.R.S. § 35-46-102 (Colorado Fence Law) ("any person" entitled to recover damages when livestock trespasses on fenced property).

9.      The Plaintiffs are challenging certain statutory provisions, recently adopted by the Colorado General Assembly as part of Senate Bill 21-087, which authorize uninvited parties to enter the Plaintiffs' farms and ranches, as well as the farms and ranches of other Colorado agricultural employers, in violation of the Fifth Amendment.

10.     Specifically, the Plaintiffs are challenging, both as applied to them and on their face, C.R.S. § 8-13.5-202 (b) and (c) to the extent that those provisions grant "key service providers" the right to access the Plaintiffs' properties without their consent.

11.     The Plaintiffs further challenge C.R.S. § 8-13.5-204 to the extent that it authorizes the Colorado Department of Labor and Employment ("CDLE"), through its Division of Labor Standards and Statistics (the "Division"), to enforce the key service provider access provisions of Section 8-13.5-202 (b) and (c).

12.     The specific provisions of C.R.S. § 8-13.5-202 (b) and (c) and of C.R.S. § 8-13.5-204 being challenged in this matter are hereinafter referred to as the "Colorado Access Provisions" or the "Access Provisions."

13.     The Plaintiffs seek declaratory and injunctive relief against the Defendants in their official capacities, because each of them is authorized to enforce the Colorado Access Provisions.

14.     As the United States Supreme Court recently held in *Cedar Point Nursery v. Hassid*, 594 U.S. ____, 141 S. Ct. 2063, 2072 (2021), an "access regulation [that] appropriates a right to invade [a] growers' property . . . constitutes a *per se* physical taking*."*

15.     The Colorado Access Provisions, which are far more onerous than the California regulation held unconstitutional in *Cedar Point,* afford key service providers the right to access Plaintiffs' properties at a variety of times, and for an almost unlimited variety of reasons.

16.     As a consequence, the Access Provisions, in effect, impose an easement upon the Plaintiffs' properties, and thereby deprive Plaintiffs of the right to exclude uninvited parties from their farms and ranches.

17.     Accordingly, the Colorado Access Provisions, which provide agricultural employers no right to just compensation for the taking of private property rights, violate the Fifth Amendment, as applied to the State of Colorado through the Fourteenth Amendment.  For that reason, Plaintiffs are entitled to equitable relief, including a preliminary injunction, under 42 U.S.C. § 1983 and the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## THE PARTIES

18.     Plaintiffs Talbott's Mountain Gold LLLP and Talbott Land and Property LLLP (together "Talbott Farms") are Colorado limited liability limited partnerships.  Talbott Farms' property is located in and near Palisade, Colorado.

19.     Plaintiff Blaine D Produce Company LLC ("Blaine Produce") is a Colorado limited liability company.  Blaine Produce's farm property is located in and near Clifton, Colorado.

20.     Plaintiff Box Elder Ranch, LLC is a Colorado limited liability company; and Plaintiff Box Elder Ranch, Inc. is a Colorado corporation (together "Box Elder Ranch").  Box Elder Ranch's farm and ranch property is located near Wray, Colorado.

21.     Plaintiff Marc Arnusch Farms LLC ("Marc Arnusch Farms") is a Colorado limited liability company.  Marc Arnusch Farms' property is located near Keenesburg, Colorado.

22.     Plaintiff Mauch Farms, Inc. ("Mauch Farms") is a Colorado corporation.  Mauch Farms' farm property is located near Lamar, Colorado.

23.     Defendant Jared Polis is named as a Defendant in his official capacity as Governor of Colorado.

24.     Defendant Joseph M. Barela is named as a Defendant in his official capacity as Executive Director of CDLE.

25.     Defendant Scott Moss is named as a Defendant in his official capacity as Director of the Division.

## THE COLORADO ACCESS PROVISIONS

26.     On June 25, 2021, Governor Polis signed into law Colorado Senate Bill 21-087, entitled "Agricultural Workers' Rights" (the "Bill").

27.     The Bill imposes a wide variety of unprecedented employment-related obligations on Colorado agricultural employers.  At issue here, the Bill specifies that a farm or ranch business, in its capacity as an employer,

> shall not interfere with an agricultural worker's reasonable access to key service providers at any location during any time in which the agricultural worker is not performing compensable work or during paid or unpaid rest and meal breaks, and with respect to health-care providers during any time, whether or not the agricultural worker is working.

C.R.S. § 8-13.5-202 (1) (b).  For purposes of the Bill, a "key service provider" is defined as "a health care provider; a community health worker, including a promotora; an education provider; an attorney; a legal advocate; a government official, including a consular representative; a member of the clergy; *and any other service provider* to which an agricultural worker may need access."  C.R.S. § 8-13.5-201 (7) (emphasis added).

28.     C.R.S. § 8-13.5-202 (c) requires that the Division promulgate rules establishing "additional times during which an employer may not interfere with an agricultural worker's reasonable access to key service providers, including periods during which the agricultural worker is performing compensable work, especially during periods when the agricultural worker is required to work in excess of forty hours per week and may have difficulty accessing such services outside of work hours."

### THE DIVISION'S RULE

29.     On January 31, 2022, the Division adopted 7 CCR 1103-15 (the "Rule"), which became effective on May 1, 2022.  Section 1.1 of the Rule provides that the general purpose of the Rule is to "exercise the authority of this Division to enforce and implement [the Colorado Access Provisions]."

30.     As required by Section 8-13.5-202 (c) of the Bill, Section 4.3 of the Rule specifies additional times when an employer may not interfere with an agricultural worker's access to a key service provider.

31.     Section 5.1 of the Rule prohibits any retaliation for, or interference with, an agricultural worker's exercise, or attempt to exercise, any protected activity or right under the Colorado Access Provisions or the Rule.

32.     Section 5.3 outlines enforcement mechanisms available to address any alleged violation of the Colorado Access Provisions or the Rule.

## THE COLORADO EMPLOYER-PROVIDED HOUSING PROVISIONS

33.     Separate and apart from the Colorado Access Provisions, the Bill provides that, "[a]n employer shall not interfere with an agricultural worker's reasonable access to visitors at *the agricultural worker's employer-provided housing* during any time when the agricultural worker is present at such housing.  *See* C.R.S. § 8-13.5-202 (1) (a) (emphasis added).

34.     The Bill further states that:

> No person other than [an] agricultural worker may prohibit, bar, or interfere with, or attempt to prohibit, bar, or interfere with, the access to or egress from *the residence of any agricultural worker* by any person, either by the erection or maintenance of any physical barrier, by physical force or violence or by the threat of physical force or violence, or by any order or notice given in any manner.

*See* C.R.S. § 8-13.5-202 (2) (emphasis added) (collectively with subsection (1) (a), "the Housing Provisions").

## THE COLORADO TRANSPORTATION PROVISIONS

35.     The Bill also imposes an obligation upon agricultural employers, who "provid[e] housing and transportation for agricultural workers,"

> to at least one day per week, provide transportation to the agricultural workers to a location where the workers can access basic necessities, conduct financial transactions, *and meet with key*

> ***service providers***; except that transportation must be provided not
> less than one day every three weeks for range workers who are
> actively engaged in the production of livestock on the open range."

*See* C.R.S. § 8-13.5-202 (1) (e) (emphasis added).

36.     "If an agricultural worker has access to the worker's own vehicle and is permitted

to park the vehicle on the employer's property, the employer is not required to provide

transportation as set forth in [Subsection (1) (e)]."  *See* C.R.S. 8-13.5-202 (1) (f) (collectively

with Subsection (1) (e), the "Transportation Provisions").

**STANDING**

**Talbott Farms**

37.     Talbott Farms' fruit farming operations are located just east of Grand Junction,

across the Colorado River from the Town of Palisade, Colorado.  Declaration of Bruce Talbott,

attached as Exhibit 1, at ¶ 2.

38.     Talbott Farms is known throughout the Mountain West for the fruits produced in

its orchards and vineyards, including its renowned Palisade Peaches.  *Id*.

39.     Through two component companies, Talbott's Mountain Gold LLLP and Talbott

Land and Property LLLP, Talbott Farms has access to, and operates on, a patchwork of non-

contiguous parcels of private agricultural property, totaling approximately 550 acres, that are not

open to the general public.  *Id*. at ¶¶ 3-7.

40.     As an owner or a tenant, Talbott Farms is the exclusive occupant of, and controls

access to, all of the property it farms.  *Id.* at ¶ 6.

41.     Talbott Farms' operations are seasonal, and its employee census therefore varies throughout the year, from a low of approximately 30 people, to a harvest-season total of approximately 110.  *Id.* at ¶ 8.

42.     Talbott Farms owns and provides housing for those of its employees who participate in the federal H-2A Temporary Agricultural Program, through which foreign, non-immigrant workers gain the opportunity for Talbott Farms employment.  *Id.* at ¶ 9.

43.     Talbott Farms has always permitted employees to invite visitors into their dorm units, which are easily accessible from public roads.  *Id.*

44.     Talbott Farms' employees have access to vehicles owned by Talbott Farms that they are welcome to use whenever they need to make a trip to Palisade for personal business. The Farm provides transportation for any employee who is unable, or does not desire, to drive. *Id.* at ¶ 10.

45.     Talbott Farms' food safety plan, and its related compliance programs, are of utmost importance to its operation.  Talbott Farms maintains positions of employment, the sole focus of which is compliance with federal, state, and industry food safety standards.  *Id.* at ¶ 11.

46.     Talbott Farms is subject to periodic Good Agricultural Practices ("GAPs") and Good Handling Practices ("GHPs") audits conducted under the supervision of the Colorado Department of Agriculture and in accordance with the United States Department of Agriculture Fresh Produce Audit Verification Program.  *Id.* at ¶ 12.

47.     The GAPs and GHPs to which Talbott Farms adheres are not compatible with having unannounced key service providers coming onto Talbott Farms' properties at any location and at any time.  The Colorado Access Provisions therefore threaten Talbott Farms' ability to

continue achieving outstanding scores on GAP and GHP audits, which could adversely affect its business operations. *Id.* at ¶¶ 14-15.

48.     Talbott Farms is in the process of undertaking an additional auditing regimen based on Global Food Safety Initiative benchmarks. Passing this audit is critical to the Farm's ability to sell its produce to regional and national grocery retailers. It includes requirements that are not compatible with the Access Provisions' authorization of service providers coming onto Farm property in search of employees with whom they wish to meet. *Id.* at ¶ 16.

49.     Talbott Farms challenges the Colorado Access Provisions because they appropriate its right to exclude from its orchards, vineyards, and packing houses individuals who, but for the Access Provisions, would be trespassers. *Id.* at ¶ 17.

**Blaine Produce**

50.     Blaine Produce operates greenhouses, shade tunnels, and cultivated fields on properties that it owns in and near Clifton, Colorado, just east of Grand Junction. Declaration of Blaine Diffendaffer, attached as Exhibit 2, at ¶ 3.

51.     Blaine Diffendaffer is the founder and sole proprietor of Blaine Produce, which does business as "Blaine's Tomatoes & Farm." *Id.* at ¶ 2.

52.     Blaine Produce's five greenhouses and four shade tunnels are located on private property that Mr. Diffendaffer's parents acquired in 1969, and where Mr. Diffendaffer grew up. The greenhouses and shade tunnels are not open to the general public. *Id.* at ¶¶ 4-5.

53.     Blaine Produce's cultivated fields are also located on private property that the company controls, and that is not open to the public. *Id.* at ¶¶ 3 & 5.

54.     Blaine Produce grows signature hybrid and heirloom tomatoes, as well as specialty greens, vegetables, fruits, and flowers.  *Id.* at ¶ 6.

55.     Blaine Produce currently employs four people who work in its greenhouses, shade tunnels, and fields, and plans to add one or two more employees in the near future.  These employees are each engaged in "agriculture" and are "agricultural workers" for purposes of the Access Provisions.  *Id.* at ¶¶ 7-8.

56.     All of Blaine Produce's employees reside in or near Grand Junction, and travel to and from Blaine Produce's greenhouses, shade tunnels, and fields throughout the work week.  *Id.* at ¶¶ 9-10.

57.     Because Blaine Produce produces food for human consumption, and in order to meet the demands of its customers, the company maintains strict food safety protocols throughout its farming operations.  *Id.* at ¶ 11.

58.     For example, Blaine Produce's greenhouse employees must frequently wash their hands; must wear lab coats and latex gloves; and must disinfect their shoes whenever entering a greenhouse.  They are also required to regularly disinfect the tools they use to tend the soils and growing plants, and the surfaces on which they work.  *Id.* at ¶ 12.

59.     None of Blain Produce's greenhouses, or the properties on which they are located, are open to the general public.  *Id.* at ¶ 5.

60.     The Colorado Access Provisions open Blaine Produce's private property to people who are unknown to Blaine Produce; who Blaine Produce did not invite; who are not required to provide Blaine Produce with notice in advance of their arrival; and who Blaine Produce is prohibited from interfering with.  *Id.* at ¶¶ 13-14.

61.     The specialty fruits, vegetables, and flowers that Blaine Produce grows in its greenhouses, shade tunnels, and fields, are, at times, fragile.  Just as important, they are also susceptible to disease.  *Id.* at ¶ 15.

62.     In particular, the tobacco mosaic virus, if introduced into a greenhouse or onto a field, could diminish production by up to twenty percent and ruin tomatoes or other produce worth thousands of dollars.  This virus often exists on the hands and clothing of people who use tobacco products, is easily transmitted to plants, and once established, can be very difficult to eradicate.  *Id.* at ¶ 16.

63.     Of even greater concern to Blaine Produce is the possibility that a key service provider who wanders onto one of its fields, or into one of its greenhouses or shade tunnels, would introduce the tomato brown rugose fruit virus ("ToBRFV").  This virus, which is highly virulent and frequently identified on the surfaces of grocery chain tomatoes and peppers grown in Mexico and Canada, can destroy an entire crop.  ToBRFV can be carried on human skin or clothing and is easily transmitted by touching anything that comes into contact with plants or their fruit.  The only practical method of eradicating ToBRFV is to destroy affected plants, and to dispose of potentially contaminated soils.  *Id.* at ¶ 17.

64.     The fact that the Colorado Access Provisions provide Blaine Produce with only a limited right to establish "protocols designed to manage biohazards and other risks of contamination" and "to promote food safety" affords the company little comfort, given the devastating consequences it could confront should a key service provider ignore its posted warnings and enter one of its greenhouses, shade tunnels, or fields.  *Id.* at ¶ 18.

65.     Moreover, the Colorado Access Provisions afford Blaine Produce no right to remove or exclude a key service provider who refuses to comply with its health and safety protocols.  Instead, the Access Provisions give the service provider the right to file an administrative complaint, or a lawsuit, against Blaine Produce for "interference."  *Id.* at ¶ 19.

66.     But for the Access Provisions, Blaine Produce would not permit every person who identifies themself as a service provider to enter its private property without its consent.  *Id.* at ¶ 21.

67.     Blaine Produce challenges the Colorado Access Provisions because they appropriate its right to exclude from its greenhouses, shade tunnels, and fields individuals who, but for the Access Provisions, would be trespassers.

**Box Elder Ranch**

68.     Box Elder Ranch is a row crop and feedlot operation located on private property in Yuma County, Colorado, due south of the Town of Wray.  Declaration of Audrey Rock, attached as Exhibit 3, at ¶ 2.

69.     The Ranch owns the property it occupies, which is not open to the general public.  *Id.* at ¶ 10.

70.     Box Elder Ranch is composed of two business entities:  Box Elder Ranch, LLC and Box Elder Ranch, Inc.  *Id.* at ¶ 3

71.     Box Elder Ranch, LLC owns the property on which the Ranch operates.  It leases that property to Box Elder Ranch, Inc.  *Id.* at ¶ 4.

72.     Box Elder Ranch, Inc. is the operating entity that employs the Ranch's workforce.  *Id.* at ¶ 5.

73.     Box Elder Ranch is the sole occupant of the property on which the Ranch operates, and, other than with respect to Key Service Providers, the Ranch controls access to that property.  *Id*. at ¶ 10.

74.     In addition to feeding beef cattle, the Ranch maintains a bison herd on its property.  *Id.* at ¶ 6.

75.     Box Elder Ranch presently hires eight full-time employees and adds a few part-time employees at harvest.  All of its employees are actively engaged in farming and ranching operations.  *Id*. at ¶ 7.

76.     Box Elder Ranch does not provide employee housing on its farm and ranch property.  The Ranch foreman lives in a house the Ranch owns that is several miles from Ranch headquarters.  The foreman is free to invite guests to his residence as and when he wishes to do so.  *Id*. at ¶¶ 8-9.

77.     Uninvited visitors coming onto Box Elder Ranch property, without notice and at any time the Ranch is operating, pose significant risks for the Ranch, not only because of potential interruptions in its operations, but also because of the potential for physical harm.  *Id.* at ¶ 11.

78.     With respect to the Ranch's cultivated acreage, people identifying themselves as key service providers may, without intending to do so, interfere with irrigation; damage crops; and sustain serious injuries owing to the heavy equipment Ranch employees operate, particularly during harvest.  *Id.* at ¶ 12.

79.     Of greater concern is the possibility that key service providers will interact with the Ranch's livestock, which can seriously injure a person who is not familiar with large animals.

The Ranch is particularly concerned about people coming into contact with its bison herd.  *Id. at* ¶ 13.

80.     Box Elder Ranch also has concerns about disease being spread by key service providers who visit multiple feedlots or other livestock operations in a single day.  Because of the Colorado Access Provisions, the Ranch faces the risk of losing cattle or bison to a disease outbreak instigated by people the Ranch does not know, did not invite, and over whom it has little or no control while on its property.  *Id*. at ¶ 14.

81.     Box Elder Ranch has previously been targeted by activists who have come onto its property and created problems for its employees and for its livestock.  Box Elder Ranch does not wish to have its property – which is easily accessible from public roads – similarly invaded by key service providers who can claim a right to be on the property, as well as a right to be free from "interference" while there.  *Id.* at ¶ 15.

82.     The Ranch understands that the Colorado Access Provisions are now in effect and intends to comply with them.  *Id*. at ¶ 16.

83.     Box Elder Ranch challenges the Access Provisions because they appropriate its right to exclude from its cultivated fields, feedlots, and Ranch headquarters individuals who, but for the Access Provisions, would be trespassers.  *Id*. at ¶ 17.

**Marc Arnusch Farms**

84.     Marc Arnusch and his family own and operate Marc Arnusch Farms.  Declaration of Marc Arnusch, attached as Exhibit 4 at ¶ 2.

85.     Marc Arnusch Farms cultivates approximately 2,500 irrigated and dry-land acres located in Weld County, Colorado.  It grows seed wheat, seed barley, corn silage and alfalfa to

support local dairies, and specialty artisan grains for use in craft brewing and distilling.  *Id.* at ¶¶ 2-3.

88. Marc Arnusch Farms controls access to all of the land it cultivates, no portion of which is open to the general public.  *Id.* at ¶ 4.

87. Owing to its adoption of advanced technologies, including GPS-directed, remotely controlled farm equipment, Marc Arnusch Farms presently requires only four employees.  *Id.* at ¶ 5.

88. Marc Arnusch Farms provides on-farm housing for one employee.  *Id.* at ¶ 6. That employee is welcome to invite guests into his employer-provided home.  He owns several vehicles with which to make trips to the nearby town of Keenesburg, or elsewhere, to attend to personal business.  In addition, the Farm makes a truck available to him.  *Id.* at ¶ 6-7.

89. Owing to the Colorado Access Provisions, Marc Arnusch Farms' properties are now open to anyone who identifies themself as a key service provider, with few limitations.  *Id.* at ¶ 8.

90. The Access Provisions provide Marc Arnusch Farms with no recourse for dealing with a group of key service providers who come onto its private property without an invitation, and without advance notice, and claim a right to go anywhere on the property in search of employees.  *Id.* at 9.

91. Rather, the Access Provisions prohibit Marc Arnusch Farms from interfering with such a group while it takes access to the Farm's private property, and threaten the Farm with administrative sanctions and lawsuits if it attempts to do so.  *Id.*

92.     The virtually unfettered access that the Colorado Access Provisions grant to key service providers also creates significant problems for Marc Arnusch Farms in meeting its obligation, under the Colorado Premises Liability Act, to protect people who come onto its farm from injury, given the automated heavy equipment that is frequently in use during planting and harvesting seasons.  *Id.* at ¶ 10.

93.     Marc Arnusch holds a Private Pesticide Applicator's License issued by the Colorado Department of Agriculture and routinely applies pesticides to crops grown by Marc Arnusch Farms.  While these pesticides are safe when used by applicators with adequate training and equipment, they can become harmful to humans at certain points in the application process absent appropriate safety precautions.  *Id*. at ¶ 11.

94.     The Farm is concerned that key service providers authorized to take access to its private property, without advance notice and without its owners' consent, could come into contact with, and be harmed by, the pesticides the Farm applies, thereby compromising its compliance with both federal and state regulations that govern Mr. Arnusch's applicator's license.  *Id*. at ¶ 12.

95.     Marc Arnusch Farms challenges the Colorado Access Provisions because they require the farm to permit self-identified service providers, who appear without warning, to immediately, and with few if any restrictions, take access to its private property.  In doing so, the Access Provisions appropriate Marc Arnusch Farms' right to exclude from its family farm individuals who, but for those Provisions, would be trespassers.  *Id*. at ¶ 13.

**Mauch Farms**

96.    Mauch Farms is a family farm that has been in operation since 1940.  It cultivates

approximately 4,000 irrigated acres in Prowers County, Colorado, north of the City of Lamar.

Declaration of Dale Mauch, attached as Exhibit 5, at ¶¶ 3-4.

97.    The Farm raises alfalfa, corn, wheat, and sorghum, as well as beef cattle.  *Id.* at ¶

4.

98.    Mauch Farms' operations are located on a "checkerboard" of private property,

some of which the Mauch family owns and some of which it leases.  No part of the Farm is open

to the general public and Mauch Farms is in control of access to all of the property it farms.  *Id.* at

¶ 10-12.

99.    Mauch Farms employs eight people in full-time positions at present.  One of these

employees has been a part of the Mauch Farms team for forty years.  *Id.* at ¶ 5.

100.    All of Mauch Farms' employees are involved in agricultural production and all

are "agricultural workers" as defined for purposes of the Access Provisions.  *Id.* at ¶ 7.

101.    Mauch Farms does not provide employee housing.  Rather, its employees live in

or near Lamar.  The Farm provides vehicles with which its employees travel to and from its

properties, as well as to the irrigation ditches that serve those properties.  *Id.* at ¶¶ 8-9.

102.    Owing solely to the Colorado Access Provisions, Mauch Farms must now permit

uninvited "service providers" to take access to the properties that it cultivates.  *Id.* at ¶ 14.

103.    The Access Provisions' override of Mauch Farms' right to exclude uninvited

visitors from its private, agricultural properties may well increase its operating costs.  *Id.* at ¶¶

14-15.

104.    Without intending to do so, service providers who take access to Mauch Farms'
property can easily interfere with its irrigation systems, which are critical to its farming
operations.  *Id*. at ¶ 16.

105.    Service providers with little, if any, farm experience may also trample and destroy
crops, without realizing that they are doing so.  *Id.*

106.    Besides interfering with irrigation equipment and damaging crops, a service
provider could be injured by the large – and potentially dangerous – equipment that Mauch
Farms' employees frequently operate, particularly during planting and harvest seasons.  *Id*. at ¶
17.

107.    When such an injury inevitably occurs to a service provider who has taken access
to the Farm's property, the cost of the Farm's property and casualty insurance will almost
certainly increase, further stretching its already thin financial margins.  *Id*. at ¶ 18.

108.    Mauch Farms is, and will continue, complying with the Colorado Access
Provisions solely because of its legal obligation to do so.  Absent those Provisions, Mauch Farms
would not permit all self-identified "service providers" to enter its farm properties without its
consent.  *Id*. at ¶ 19.

109.    Mauch Farms challenges the Colorado Access Provisions because they
appropriate its right to exclude from its private, cultivated, and irrigated fields those who, but for
the Access Provisions, would be trespassers.  *Id*.

**Plaintiffs' Injuries in Fact & Likelihood of Redress**

110.    Owing to the Colorado Access Provisions, each of the Plaintiffs has suffered an
invasion of a legally protected interest, namely their Fifth Amendment protections against the

state government's taking of private property without just compensation.  For that reason, each of the Plaintiffs has, by virtue of the adoption of the Access Provisions by the Colorado General Assembly, suffered an injury in fact.

111.     It is likely that the injury in fact each Plaintiff has suffered as a result of the Access Provisions will be redressed by a decision favorable to Plaintiffs in this matter.

112.     For these reasons, each of the Plaintiffs has standing to bring the claims asserted herein.

### *CEDAR POINT NURSERY v. HASSID* & THE COLORADO ACCESS PROVISIONS

113.     On June 23, 2021, two days before Governor Polis signed the Bill, the United States Supreme Court issued its opinion in *Cedar Point Nursery v. Hassid*, in which agricultural employers mounted an as-applied, constitutional challenge to a California Agricultural Labor Relations Board regulation that provided labor organizations a "right to take access" to their private property in order to solicit interest in unionization (the "California Regulation").  *See Cedar Point*, 141 S. Ct. at 2069.

114.     As the Court concisely explained the core issue:

> [N]o one disputes that, without the [California Regulation], the growers would have had the right under California law to exclude union organizers from their property.  And no one disputes that the [California Regulation] took that right from them.

*Cedar Point*, 141 S. Ct. at 2076.

115.     Squarely addressing this issue, the Court determined that the California Regulation imposed a *per se* physical taking, without just compensation, upon the *Cedar Point* plaintiffs, thereby violating the Fifth and Fourteenth Amendments.  *See Cedar Point*, 141 S. Ct. at 2072.

116.     Specifically, the Court held that:

> The [California Regulation] appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking. The regulation grants union organizers a right to physically enter and occupy the growers' land for three hours per day, 120 days per year. Rather than restraining the growers' use of their own property, **the [California Regulation] appropriates for the enjoyment of third parties the owners' right to exclude.**

*Id.* at 2072 (emphasis added).

117.     Rejecting the State's assertion that the California Regulation was merely a regulatory limitation on use, rather than a *per se* taking of property rights, the Court explained that it could not "agree that the right to exclude is an empty formality, subject to modification at the government's pleasure.  On the contrary, it is a 'fundamental element of the property right,' that cannot be balanced away." *Id*. at 2077 (citations omitted).

118.     In reference to its prior decisions in *National Labor Relations Board v. Babcock*, 351 U.S. 105 (1956), and *Lechmere, Inc. v. National Labor Relations Board*, 502 U.S. 527 (1992), the Court also noted that neither *Cedar Point* plaintiff housed employees on its agricultural properties.  *See Cedar Point*, 141 S. Ct. at 2069-70.  As the Court explained, with respect to claims arising under the National Labor Relations Act, union organizers could potentially assert a limited right to access an employers' property to contact employees who resided on that property and were otherwise "'beyond the reach of reasonable union efforts to communicate with them.'"  *Id.* at 2077 (quoting *NLRB v. Babcock*, 351 U.S. at 113); *see also Lechmere*, 502 U.S. at 537 (the Court does not endorse the theory that the NLRA permits "reasonable" trespasses; where reasonable alternative means of communication exist, the NLRA does ***not*** guarantee union organizers the right to trespass on private property).

119.    The service provider right of access imposed by the Colorado Access Provisions is far broader, and substantially more violative of private property rights, than was the union organizer access right created by the California Regulation at issue in *Cedar Point*.

120.    For example, the California Regulation expressly excluded dairy farm milking barns and milk houses, poultry farm hatcheries and enclosed egg production areas, and covered growing areas of floral nursery operations from organizer access. *See* Calif. Code Regs. § 20901 (Limitation for Special Segments of Agriculture). The Colorado Access Provisions include no limitations on service provider access to any Colorado employer's property.

121.    Likewise, access under the California Regulation was limited to labor organizers, while the Colorado Access Provisions open farm and ranch property to demands for access by any service provider "to which an agricultural worker may need access." *See* C.R.S. §§ 8-13.5-201 (7); 8-13.5-202 (1) (b).

122.    The California Regulation limited union organizers' right to invade agricultural employers' private property to not more than four, identified, thirty-day periods each year. *See* Calif. Code Regs. § 20900 (e) (1). By contrast, the Colorado Access Provisions impose no limit on the number of days service providers may demand access to the property of employers in general, and agricultural employers in particular.

123.    The California Regulation allowed access only after filing notice with the California Agricultural Labor Relations Board, and service of notice on the landowner. *See* Calif. Code Regs. § 20900 (e) (1). The Colorado Access Provisions require no notice whatsoever that self-identified "service providers" intend to invade a farm or ranch.

124.     The California regulation limited the number of organizers that could access an agricultural employer's property, and required organizers to wear badges identifying themselves. *See* Calif. Code Regs. § 20900 (4) (A)-(C).  By contrast, the Colorado Access Provisions offer no protection whatsoever to employers with respect to how many service providers may lawfully invade their property at one time.

125.     In contrast to the facts at issue in *Cedar Point*, whether an employer provides housing on its property is irrelevant to the claims asserted here, as, separate from the Access Provisions, the Bill's Housing Provision expressly prohibits any employer from interfering with an agricultural worker's access to visitors at the worker's employer-provided housing.  *See* C.R.S. § 8-13.5-202 (1) (a).  Plaintiffs do not challenge the Housing Provision of the Bill.

126.     Further, the Bill's Transportation Provision requires all agricultural employers that provide housing and transportation for agricultural workers who do not have access to a vehicle of their own to afford transportation to town or another location where the workers can, among other activities, meet with service providers.  *See* C.R.S. § 8-13.5.202 (1) (e).  The Plaintiffs do not challenge the Bill's Transportation Provision.

127.     As a consequence, the *Babcock* and *Lechmere* Courts' concern with employees being beyond the reach of reasonable efforts to communicate with them is directly addressed, and obviated, by the Housing and Transportation Provisions of the Bill and, therefore, are irrelevant to the Plaintiffs' challenge to the Access Provisions.

128.     In sum, the Colorado Access Provisions create a substantially broader right for non-employee third parties to invade employer property than did the California Regulation at issue in *Cedar Point*.  As a consequence, the Access Provisions deprive Colorado farm and ranch

owners of precisely the right to exclude that was central to the Supreme Court's conclusion that the California Regulation imposed a *per se* physical taking of private property without just compensation, and for that reason, violated the Fifth and Fourteenth Amendments.

## FACIAL CONSTITUTIONAL CHALLENGE

129.    Plaintiffs attack the Colorado Access Provisions on purely legal grounds and contend that the Access Provisions are invalid with respect to Colorado agricultural employers, as defined by C.R.S. § 8-3-104 (a) and as described below, without exception.

130.    Plaintiffs' claims, and the relief that would follow, reach beyond their own, particular circumstances to all Colorado agricultural employers who, but for the Access Provisions, would, in accordance with Colorado law, hold the right to exclude key service providers from the property they own or lease for purposes of engaging in agriculture.

131.    More particularly, Plaintiffs assert that the Colorado Access Provisions, on their face, violate the Fifth and Fourteenth Amendments and, therefore, cannot be enforced against Colorado agricultural employers with respect to property they own or lease and on which they engage in agriculture, that is not open to the general public, and from which they have the right to exclude third parties as provided in Colorado law.  *See United States v. Supreme Court*, 839 F.3d 888, 914 (10th Cir. 2016) (facial standards should be applied only to the universe of applications contemplated by plaintiffs' claim, and not to all conceivable applications contemplated by a challenged provision); *id.* at 916, n. 15 (facial challenge may be limited to a subset of applications of the challenged statute).

## AS-APPLIED CONSTITUTIONAL CHALLENGE

132.    A party "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *U.S. v. Supreme Court*, 839 F.3d at 907.

133.    Even if the Colorado Access Provisions are not unconstitutional and unenforceable with respect to the subset of all Colorado employers described above, they are clearly unenforceable with respect to the Plaintiffs.

134.    In particular, each Plaintiff regularly hires one or more employees to engage in agricultural labor on property that is not open to the public and from which the Plaintiff may, but for the Access Provisions, exclude key service providers in accordance with Colorado law.

## DECLARATORY RELIEF ALLEGATIONS

135.    Under the Fifth and Fourteenth Amendments, Plaintiffs have a right to be free from laws that take private property for public use without providing a mechanism for awarding just compensation.

136.    Defendants are charged with enforcing the Access Provisions, which physically take an interest in private property, but afford agricultural employers no means of obtaining just compensation for that *per se* taking.

137.    There is a justiciable controversy in this case as to whether the Access Provisions, on their face, violate the Fifth and Fourteenth Amendments with respect to Colorado agricultural employers who engage in agriculture on property from which, but for the Access Provisions, they would have the right to exclude service providers.

138.     There is, in the alternative, a justiciable controversy as to whether the Access Provisions, as applied to the Plaintiffs, violate the Fifth and Fourteenth Amendments by imposing a *per se* taking, without just compensation, upon the Plaintiffs.

139.     A declaratory judgment as to whether the Access Provisions unconstitutionally take private property without compensation will clarify the legal relations between Plaintiffs and Defendants with respect to enforcement of the Access Provisions.

140.     A declaratory judgment as to the constitutionality and legality of the Access Provisions will give the parties relief from the uncertainty and insecurity giving rise to this controversy.

## INJUNCTIVE RELIEF ALLEGATIONS

141.     Plaintiffs have no adequate remedy at law to address the unconstitutional taking of their property effected by the Access Provisions and under the color of state law.

142.     In light of *Cedar Point*, there is a substantial likelihood that Plaintiffs will succeed on the merits of their claims that the Access Provisions unconstitutionally take private property.

143.     Plaintiffs are required to allow key service providers to enter their property under the authority of the Access Provisions.  They cannot avoid these events without judicial relief, and will suffer irreparable injury absent a preliminary injunction restraining Defendants from enforcing the Access Provisions.

144.     Likewise, Plaintiffs will suffer irreparable harm absent a permanent injunction restraining Defendants from enforcing the Access Provisions.

145.    Plaintiffs' harm, the unconstitutional taking of a private property interest for the benefit of third parties, outweighs any harm the injunction might cause Defendants in particular, or the State of Colorado more generally.

## CLAIM FOR RELIEF

**(Taking of an Easement Without Just Compensation,
in violation of the Fifth and Fourteenth Amendments, through 42 U.S.C. § 1983)**

146.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 145 above as though fully set forth herein.

147.    The Fifth Amendment to the Constitution, made applicable to the States through the Fourteenth Amendment, provides: "nor shall property be taken for public use without just compensation."  U.S. Const. amend. V.

148.    The United States Supreme Court has recognized that the Declaratory Judgment Act, 28 U.S.C. § 2201, "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."  *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978).

149.    Plaintiffs need not seek a remedy under state law before bringing this action in federal court, and their claims are therefore ripe for this Court's adjudication.  *See Knick v. Twp. of Scott*, 588 U.S. ___, 139 S. Ct. 2162 (2019) (setting aside obligation to seek compensation via inverse condemnation action).

150.    Given the foregoing, the only proper remedies for the constitutional taking injury alleged in this case are declaratory and injunctive relief, and this Court is the proper forum in which Plaintiffs may seek such relief.

151. The Access Provisions authorize service providers to enter Plaintiffs' private property without consent, and without compensation having been granted to Plaintiffs. For that reason, the Access Provisions impose unconstitutional, *per se* takings against Colorado agricultural employers, including the Plaintiffs. Consequently, Plaintiffs are entitled to declaratory and injunctive relief preventing the application or enforcement of the Access Provisions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment from this Court as follows:

1. A declaratory judgment that the Colorado Access Provisions are facially unconstitutional and, therefore, unenforceable against that subset of employers defined as agricultural employers;

2. In the alternative, a declaratory judgment that the Colorado Access Provisions are unconstitutional as applied to Plaintiffs and, therefore, unenforceable against them;

3. An order enjoining Defendants from enforcing the Colorado Access Provisions against Colorado agricultural employers;

4. In the alternative, an order enjoining Defendants from enforcing the Colorado Access Provisions against the Plaintiffs;

5. An award to Plaintiffs of reasonable attorneys' fees for bringing and maintaining this action pursuant to 42 U.S.C. § 1988;

6. An award to Plaintiffs of costs of suit pursuant to Federal Rule of Civil Procedure 54(d); and

7. An award to Plaintiffs of any other relief that the Court deems just and proper.

Respectfully submitted this 21st day of June, 2022.

By:  *s/Kevin C. Paul*
        Kevin C. Paul
        RANGE PC
        600 Grant Street, Suite 650
        Denver, Colorado 80203
        Phone Number:  (303) 595-4747
        E-mail: kevinpaul@range.law

        Todd Miller
        MILLER & MILLER, LLC
        1301 Arapahoe Street, Suite 105
        Golden, Colorado 80401
        Phone Number:  (303) 877-2681
        E-mail: todd@millerlawco.com

        Attorneys for Plaintiffs