**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01537-NYW-GPG

TALBOTT'S MOUNTAIN GOLD LLLP, a Colorado limited liability limited partnership;
TALBOTT LAND AND PROPERTY LLLP, a Colorado limited liability limited partnership;
BLAINE D PRODUCE COMPANY LLC, a Colorado limited liability company;
BOX ELDER RANCH, LLC, a Colorado limited liability company;
BOX ELDER RANCH, INC., a Colorado corporation;
MARC ARNUSCH FARMS LLC, a Colorado limited liability company; and
MAUCH FARMS, INC., a Colorado corporation,

      Plaintiffs,

v.

JOSEPH M. BARELA, in his official capacity as Executive Director of the Colorado
Department of Labor and Employment; and
SCOTT MOSS, in his official capacity as Director of the Division of Labor Standards and
Statistics, Colorado Department of Labor and Employment,

      Defendants.

---

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
AND INCORPORATED MEMORANDUM OF LAW**

---

# TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................................1

II.  BACKGROUND ..........................................................................................................2

III.  LAW AND ARGUMENT .............................................................................................6

   A.  Legal standard for preliminary injunctions. ..........................................................6

   B.  The key-service-provider provisions are presumed valid and constitutional. .....................8

   C.  Plaintiffs are unlikely to succeed on the merits of their claims because the key-service-provider provisions do not effect a compensable taking. ......................................10

      1.  Plaintiffs are unlikely to succeed on the merits because the Act's key-service-provider provisions fall within the police power exception to takings. ..........................10

      2.  The Act is also distinguishable from the regulation in *Cedar Point* because it confers a right to workers to access key service providers, in contrast to the "right to take access" to private property that was conferred by the regulation. .............16

      3.  Plaintiffs are unlikely to succeed on the merits because the key-service-provider provisions constitute reasonable conditions exchanged for benefits conferred upon employers. ...........................................................................................19

      4.  Plaintiffs have no constitutional right to injunctive relief under the Fifth Amendment. ...................................................................................................21

   D.  Plaintiffs will not experience any irreparable harm without a preliminary injunction. ....................................................................................................24

E.    The balance of the equities and the public interest weigh in favor of allowing

      enforcement of the Act during the pendency of these proceedings. .................................25

F.    If the court determines that Plaintiffs are entitled to injunctive relief, the

      challenged provisions are severable from the remainder of the Act.................................26

IV.    CONCLUSION..............................................................................................................29

Joseph M. Barela, in his official capacity as Executive Director of the Colorado

Department of Labor and Employment ("CDLE"); and Scott Moss, in his official capacity as

Director of the CDLE Division of Labor Standards and Statistics ("Division"), by and through

their counsel of record at the Office of the Colorado Attorney General, respectfully submit the

following Response to Plaintiffs' Motion for Preliminary Injunction and Incorporated

Memorandum of Law, and state as follows:

## I.   INTRODUCTION

Colorado's Agricultural Labor Rights and Responsibilities Act (the "Act") ensures that

agricultural workers—many of whom perform essential but dangerous physical labor in remote

locations with minimal resources—have access to key service providers necessary to promote

their health, safety, and humane working conditions. The Act accomplishes this goal by

prohibiting agricultural employers from interfering with their employees' "reasonable access" to

key service providers, even when such access might occur on private agricultural property. § 8-

13.5-202(b) & (c), C.R.S. (2022).

Relying on *Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063 (2021), Plaintiffs argue that

the Act's key-service-provider provisions "appropriate from Plaintiffs, as well as from all

Colorado agricultural employers subject to them, an easement granting access to key service

providers" that violates the Takings Clause of the Fifth Amendment. ECF 13, p. 12. But

Plaintiffs' position does not account for the Act's reasonableness standard and the myriad

circumstances under which agricultural employers retain the right to limit or refuse to allow key

service providers onto private property. Indeed, while the regulation in *Cedar Point* granted a

right for union organizers to access private property at specific times and for specific durations,

the Act does not. Instead, the Act promotes access to key service providers both on and off private property by prohibiting employers from engaging in unreasonable interference. In doing so, the Act does not mandate on-site access for key service providers under any specific set of circumstances. Rather, the Act allows employers to develop objectively reasonable access policies based on individualized circumstances. As such, the Act does not give rise to a *per se* taking under the *Cedar Point* rule. The key-service-provider provisions also fit within exceptions to the *per se* rule delineated in *Cedar Point*.

Because Plaintiffs fail to account for these distinctions, they are unlikely to succeed on the merits of their claim. Plaintiffs also will not experience irreparable harm without a preliminary injunction because their claims of irreparable harm are predicated upon an alleged constitutional violation that has not occurred. Moreover, the equities and the public interest weigh heavily in favor of ensuring that agricultural workers will continue to have access to key service providers, such as those providing medical services, during the pendency of these proceedings. As explained in more detail below, such access is critically important to protect the health, safety, and wellbeing of historically marginalized and vulnerable agricultural workers.

## II.  BACKGROUND

Approximately 40,000 agricultural workers generate roughly $40 billion for Colorado's economy each year.[1] During peak seasons, 30-50% of those workers work a significant amount

---

[1]*See* U.S. Department of Agriculture, Census of Agriculture (2017), Table 71, p. 17, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_Sta te_Level/Colorado/st08_1_0071_0071.pdf (identifying more than 36,000 agricultural workers in Colorado as of 2017); *and* The Plight of Farm Workers, http://www.coloradofarmworkers.org/the-plight-of-farm-

of overtime, spending an average of 53 to 67 hours laboring under grueling conditions each week. *Id.* Yet, despite being "one of the most integral workforces in the United States . . . [agricultural workers] are also among the most abused and mistreated workers." *Id.* Indeed, agricultural labor ranks among the top 10 most dangerous and difficult jobs in the United States, as workers often deal with heavy machinery, pesticides and heat stroke." *Id.* Compounding these difficulties, agricultural workers are "among the worst compensated employees in the country, ranking in the bottom 10 lowest paying jobs." *Id.*

In 2021, the Colorado Legislature passed Senate Bill 21-87, the Agricultural Labor Rights and Responsibilities Act (the "Act"), to address chronic inequities in wages and working conditions for Colorado's agricultural workers. In addition to providing other protections to agricultural workers, the Act added part 2 to article 13.5 of title 8 of the Colorado Revised Statutes. *See* §§ 8-13.5-201 through 8-13.5-205, C.R.S. (2022). This new part 2 sets a floor on working conditions for agricultural workers to protect them from things like foreseeable and preventable heat injury and ensuring reasonable access to healthcare and other key services.

The Act's legislative history highlights the uniquely challenging circumstances faced by Colorado's agricultural workers and helps to explain why the Act's key-service-provider provisions were necessary as a matter of public health and safety. The General Assembly heard over five hours of argument and testimony, and received 125 pages of written testimony (attached as **Exhibit A**) regarding the provisions of S.B. 21-87. Over 25 people, many of whom were subject matter experts, testified in support of the Act. Agricultural Labor Rights and

---

workers/#:~:text=Farm%20workers%20in%20Colorado%20deal,)%2C%20sexual%20harassment%20and%20discrimination.

Responsibilities Act: Hearing on S.B. 21-87 before the S. Comm. on Business, Labor, & Technology, 73rd Gen. Assem., Reg. Sess. (Colo. 2021), March 17, 2021 (hereafter, "Mar. 17, 2021, S. Comm. Hrg."); Hearing on S.B. 21-87 before the H. Comm. on State, Civic, Military, & Veterans Affairs, 73rd Gen. Assem., Reg. Sess. (Colo. 2021), June 3, 2021 (hereafter, "June 3, 2021, H. Comm. Hrg.").

Bill sponsor Senator Jessie Danielson argued that the protections provided in the Act were necessary because agricultural employers were not required to pay their workers minimum wage or overtime and the workers could not unionize. She further argued that some workers were prohibited from having visitors or seeking out services like medical care, some were victims of human trafficking, and some faced serious retaliation for complaining. Mar. 17, 2021, S. Comm. Hrg., 2:58:50 – 3:00:25. The testimony in support of S.B. 21-87 showed that agricultural workers, including migrant workers in the H-2A program, worked long hours and faced unsafe and unhealthy conditions, including being prevented from accessing healthcare providers and other services. Jenifer Rodriguez, managing attorney of the Migrant Farm Worker Division of Colorado Legal Services, which provides legal representation to agricultural workers, testified that the Act would help address the power imbalance that disfavored agricultural workers, in no small part because agricultural employers often control workers' legal status in the United States. Mar. 17, 2021, S. Comm. Hrg., Statement of Jenifer Rodriguez, 3:06:35 – 3:09:04. Dennis Dougherty, Executive Director of the Colorado AFL-CIO, testified that Colorado's values of dignity, hard work, and respect were not reflected in the conditions faced by agricultural workers. Mar. 17, 2021, S. Comm. Hrg., Statement of Dennis Dougherty, 3:09:35 – 3:11:15. He also testified that the Act would ensure the workers' safety and help avoid

public health crises by fortifying the requirement for rest breaks, providing workers with a right to minimum wage and overtime pay, and by providing workers with the right to access healthcare workers. *Id.*

To address these concerns, the Act confers a variety of rights on agricultural workers, including the right to have reasonable access to "key service providers," which the Act defines as "a health care provider; a community health worker, including a promotora; an education provider; an attorney; a legal advocate; a government official, including a consular representative; a member of the clergy; and any other service provider to which an agricultural worker may need access." § 8-13.5-201(7), C.R.S. (2022). In doing so, the Act ensures that agricultural workers have access to essential services that would otherwise be unavailable to them because of their long working hours, remote rural locations, lack of transportation, and language barriers.

Critically, however, the Act's key-service-provider provisions limit the access to key service providers and allow agricultural employers to require key service providers to follow standard protocols if they ever do need to enter private property. The Act generally prohibits agricultural employers from interfering "with an agricultural worker's *reasonable* access to key service providers . . ." and then stops short of defining what constitutes reasonable or unreasonable behavior in this context. § 8-13.5-202(1)(b) and (c) (emphasis added). In this way, the Act eschews a hardline rule such as the one held to be unconstitutional in *Cedar Point,* in favor of a fact-sensitive reasonableness analysis that will necessarily vary from case to case.

Further distinguishing the Act from the regulation in *Cedar Point*, the key-service-provider provisions give agricultural employers discretion to develop reasonable access policies

tailored to the circumstances of their own operations and the specific needs of their workers.  In some cases, such as in the event of a medical emergency, an employer may be required to allow immediate on-site access to an agricultural worker as a matter of life and death (in which case, as explained in more detail below, access would be justified by the police power and would not constitute a taking). But, in other less exigent circumstances, agricultural employers may reasonably provide access to key service providers via telephone, internet, transportation to an off-site location, or other alternative means without violating the prohibition against unreasonable interference.

This distinction provides the cornerstone for the Court's analysis of the merits of Plaintiffs' claim, and their request for preliminary injunctive relief. Because the Act's "right of access" was enacted under the Colorado General Assembly's police power, and because it is constrained by objective reasonableness and employer discretion, it does not result in a taking under the Fifth Amendment, and the Court should deny Plaintiffs their requested relief.

## III.   LAW AND ARGUMENT

### A. Legal standard for preliminary injunctions.

Preliminary injunctions are "extraordinary remed[ies]," and "the right to relief must be clear and unequivocal." *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006) (internal quotations omitted). In assessing the effect of a requested injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citation omitted).

Plaintiffs seeking a preliminary injunction must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in their favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "The final two factors [in this test] merge when the government is the" party opposing the preliminary injunction. *Nken v. Holder*, 566 U.S. 418, 435 (2009). Plaintiffs bear the burden of proof to demonstrate that each factor tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

Three types of preliminary injunctions are traditionally disfavored: (a) preliminary injunctions altering the status quo, (b) mandatory preliminary injunctions, and (c) preliminary injunctions that provide essentially all the relief sought by a plaintiff. *O Centro Espirita Beneficiente Uniao Do Vegital v. Ashcroft*, 389 F.3d 973, 775-76 (10th Cir. 2004). Plaintiffs requesting an injunction in any of these three categories face a "heightened burden" and must make a "strong showing both with regard to the likelihood of success on the merits, and with regard to the balance of harms." *Id.* This heightened burden applies here because Plaintiffs seek to modify the status quo by enjoining the enforcement of a law that was in effect for more than a year before they sought injunctive relief. The heightened burden also applies here because a preliminary injunction will have the same effect as declaratory relief that the Plaintiffs are seeking at the conclusion of this case – to preclude enforcement of the Act's key-service-provider provisions. Finally, while Plaintiffs frame their arguments as both facial and as-applied challenges to the Act's key-service-provider provisions, "the label is not what matters." *John Doe #1 v. Reed,* 561 U.S. 186, 194 (2010). Rather, "[t]he important point is that plaintiffs' claim and the relief that would follow -- [an injunction precluding enforcement of the Act's Key-

service-provider provisions entirely] -- reach beyond the particular circumstances of these

plaintiffs." *Id.; see* ECF 13, p. 35 (Plaintiffs' requested relief). As a result, Plaintiffs must satisfy

the "standards for a facial challenge to the extent of that reach." *Reed*, 561 U.S. at 194. The bar

for doing so is high: a "facial challenge to a legislative Act is, of course, the most difficult

challenge to mount successfully, since the challenger must establish that no set of circumstances

exists under which the Act would be valid." *United States v. Grimmett*, 439 F.3d 1263, 1271

(10th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

**B. The key-service-provider provisions are presumed valid and constitutional.**

Statutes and administrative regulations are presumed valid and constitutional, and the

burden is on the party attacking such statutes and regulations to show their invalidity beyond a

reasonable doubt. *Colo. Civil Rights Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1366 (Colo.

1988); *Renteria v. Colo. State Dep't of Personnel*, 811 P.2d 797, 799 (Colo. 1991); *see* § 2-4-

201, C.R.S. (2022) (when the Colorado General Assembly enacts a statute, it is presumed to

intend compliance with the constitutions of the state of Colorado and the United States).

Whenever it is reasonable and practical, "a statute must be construed in a manner consistent with

the constitutional requirements." *Renteria*, 811 P.2d at 799.  Even when a statute is potentially

susceptible to both constitutional and unconstitutional interpretations, courts must "adopt the

constitutional interpretation of the statute." *Id.*

A law does not have to be perfect to be constitutional.  *Table Servs., LTD v.*

*Hickenlooper*, 257 P.3d 1210, 1216-17 (Colo. App. 2011) ("Just because a law *could* have been

drafted with greater precision does not mean it is invalid.").  A statute also is not invalid because

other states have done it differently.  *Id.*  Here, Plaintiffs do not allege there was any deficiency inherent in the legislative or rulemaking process that resulted in the Act.

Likewise, rules promulgated by an agency are presumed to be valid, and a party challenging such rules has the burden of showing that a rulemaking body has exceeded its statutory authority.  *Table Servs.*, 257 P.3d at 1217.  "An agency's interpretation of its governing statutes and constitutional provisions is entitled to great deference, and a reviewing court may not substitute its judgment for that of the agency."  *Id.*; *see also Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n*, 157 P.3d 1083, 1088 (Colo. 2007).  Courts generally accept an agency's statutory interpretation if the agency has been charged with the statute's administration and the interpretation has a reasonable basis in the law and the record.  *Table Servs.*, 257 P.3d at 1217. Courts also may not substitute their judgment for that of a state agency charged with enforcement of a law simply because a party challenging the agency's regulations suggests an alternative way to draft the regulations.  *Id.* at 1218; *see Freedom Colo. Information, Inc. V. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 900 (Colo. 2008) ("The reviewing court should not substitute its judgment for that of the agency[] when the General Assembly by statute has consigned the matter to the exercise of the agency's sound discretion.").

Here, the Division's public rulemaking process and the accompanying procedural safeguards guarded against an "arbitrary or unbridled exercise of agency discretion in applying and enforcing the provisions" of the Act.  *See Stamm v. City & Cnty. of Denver*, 856 P.2d 54, 57 (Colo. App. 1993) (citing *Electron Corp. v. Wuerz*, 820 P.2d 356, 357-58 (Colo. App. 1991)).  A stakeholder's unhappiness with the Division's decision not to accept its position does not equate to an absence of such procedural safeguards.  *Table Servs.*, 257 P.3d at 1216.

9

**C. Plaintiffs are unlikely to succeed on the merits of their claims because the key-service-provider provisions do not effect a compensable taking.**

**1. Plaintiffs are unlikely to succeed on the merits because the Act's key-service-provider provisions fall within the police power exception to takings.**

The U.S. Supreme Court has long recognized the police powers exception to the Takings Clause. This exception recognizes that to protect the health and safety of the community, governments may take measures such as condemning unsafe structures and restricting access to hazardous areas. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 (1987); *Mugler v. Kansas*, 123 U.S. 623, 665 (1887). And, when the government does take such measures, it will not be burdened with the requirement of compensation. *See Miller v. Schoene*, 276 U.S. 272, 280 (1928) (Takings Clause did not require the State of Virginia to compensate owners of cedar trees for the value of the trees that the State had ordered destroyed; the State had acted within its police powers because the trees needed to be destroyed to prevent a disease from spreading to nearby apple orchards).

The *Cedar Point* court upheld this historical rule, holding that "while a physical invasion of private property will usually amount to a *per se* taking, no taking will be found where the government is acting to enforce pre-existing background restrictions on property rights." 141 S.Ct. at 2079; *see also State Dep't of Health v. The Mill*, 887 P.2d 993, 1002 (Colo. 1994) (explaining uses forbidden under common law principles "were never part of the landowner's 'bundle of rights that are commonly characterized as property'" (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979))). Rather, according to *Cedar Point*, entry onto private land to avert serious harm to a person is permissible and is not a taking. *See id.* (citing Restatement (Second) of Torts, § 197). Even where such entry is ultimately destructive to the property, "when

10

the state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking for purposes of the Takings Clause." *Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019).

"[T]he police power encompasses 'the authority to provide for the public health, safety, and morals.'" *Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 32 F.3d 1436, 1441 (10th Cir. 1994) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991)). The Tenth Circuit has described the police power as controlling the "use of property by the owner for the public good" while the power of eminent domain "takes property for public use." *Lamm v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971). The Tenth Circuit's conceptualization of the police power is consistent with *Cedar Point*.

Here, the Act's key-service-provider provisions fall within the State's police power because they address serious issues related to public health, safety, and morals faced by inherently vulnerable agricultural workers. The Act does not allow workers to access just anyone; rather, it limits access to those who provide key services, defining a "key service provider" to include "a health care provider; a community health worker, . . . an education provider; an attorney; a legal advocate; a government official, including a consular representative; a member of the clergy; and any other service provider to which an agricultural worker may need access." *See* § 8-13.5-201(7); *see also* CDLE Interpretive Notice and Formal Opinion #12B (interpreting the list of key service providers to focus on agricultural workers' "health and safety needs").

The evidence presented to the legislature supported the adoption of these provisions to ensure the health and safety of agricultural workers. Agricultural workers, including migrant

11

workers in the H-2A program, work long hours to make a livelihood and support their families. *See* Exh. A. For generations, they have made less than minimum wage and, until S.B. 21-87, were not entitled to overtime wages. They also were not entitled to basic labor rights such as rest and meal breaks. Mar. 17, 2021, S. Comm. Hrg., Statement of Dennis Dougherty, 3:09:35 – 3:11:15. This contributed to a power imbalance that left workers vulnerable to exploitation, exacerbated by the fact that many of these workers are afraid of the Immigrations and Customs Enforcement agency ("ICE"), are not familiar with their rights or local laws, speak little or no English, and are separated from their families. *See, e.g.*, Mar. 17, 2021, S. Comm. Hrg., Statement of Jenifer Rodriguez. Agricultural workers work long hours while exposed to the elements. *See, e.g.*, June 3, 2021, H. Comm Hrg., Statement of Thomas Acker (Hispanic Affairs Project), 7:11:42 – 7:15:21. Herders, for example, can work 20-hour days and even work 24 hours per day, 7 days per week, when they are birthing and tending to livestock out on the range. *Id.* at 7:12:32 – 7:12:50. Mr. Acker testified that in exchange for an 80 to 90-hour work week, range workers receive about $430. *Id.* at 7:11:42 – 7:15:21. Ms. Rodriguez testified that herders face significant exploitation and spend months at a time with no toilet, running water, or refrigeration. *Id.* at 7:10:32 – 7:11:31; 7:17:25 – 7:18:25.

Supporters of S.B. 21-87 testified that agricultural workers had difficulty accessing basic necessities and services. This can be due to practical problems, such as when a range worker is in an isolated and remote location without access to transportation. However, supporters also testified that agricultural employers made it difficult for workers to access basic needs and key services. Mr. Acker testified that he spoke with a herder who said that some employers will punish their herders by not bringing them food. June 3, 2021, H. Comm Hrg., Acker, 7:14:10 –

7:14:20. Jenifer Rodriguez testified that she knew of circumstances where H-2A workers ran out of food because their employer had not taken them to town for food, and the workers did not want to complaint because they were afraid of being sent home. Mar. 17, 2021, S. Comm. Hrg., J. Rodriguez, 3:06:35 – 3:09:04. Ricardo Perez of the Hispanic Affairs Project testified about an agricultural worker who, during the 2020-2021 winter, had been living at a sheep camp without any wood or propane for heat, and had gone without water for 2 days because it was frozen. Mar. 17, 2021, S. Comm. Hrg., Statement of Ricardo Perez, 3:17:35 – 3:18:07. Mr. Perez testified that the worker became sick and ultimately "escaped" from that workplace because it was his only option to survive. *Id.* Many agricultural workers rely on their employers for housing, as well as their other basic needs. Mr. Perez testified that a farmworker told him he was afraid to request better wages from his employer because he was afraid the employer would retaliate by kicking him out and he would become homeless overnight. *Id.* at 3:18:08 – 3:18:30.

Anita Rodriguez, a promotora for Project Protect, testified about egregious working conditions she had witnessed. Mar. 17, 2021, S. Comm. Hrg., Statement of Anita Rodriguez, 3:20:13 – 3:22:50. Ms. Rodriguez testified that when she first started working with agricultural workers at a camp where there were hundreds of workers, she was horrified to see that they were enclosed by a 10-foot fence with barbed wire; she recalled it looked like a prison. *Id.* at 3:20:55 – 3:21:12. Within a month, she learned that workers at this camp did not have enough food to eat, as the employer did not provide enough food. *Id.* at 3:21:13 – 3:21:22. Ms. Rodriguez testified, "They couldn't leave the camp under any circumstances, to the doctor, gas station, grocery store;" out of the hundreds of workers at the camp, "only 3 or 4 men each day could leave." *Id.* at 3:21:23 – 3:21:35. She testified they were afraid because they could not leave without

permission—if they did, they would be fired and lose their means to support their families. *Id.* at 3:21:36 – 3:21:48.

Anita Rodriguez also testified that she had received a call from an H-2A worker who felt sick and had swollen lips and bumps all over his body. Mar. 17, 2021, S. Comm. Hrg., A. Rodriguez, 3:21:49 – 3:22:29. She told legislators that instead of being able to simply go and pick up the worker to take him to the doctor, she had to strategize with him about how to get him away from the property without being detected by the employer or the employer's security guards. *Id.* He was afraid that if the employer found out he was leaving the property, he would be fired. *Id.* And that, Ms. Rodriguez testified, was on the worker's day off. *Id.*

Legislators heard testimony that in some situations, agricultural workers are prevented from visiting the doctor and other service providers. Jenifer Rodriguez testified that the workers don't get to decide when they can see a doctor; the *employer* decides when they can see a doctor. June 3, 2021, H. Comm Hrg., 7:10:32 – 7:11:31. Ms. Rodriguez, who provides legal services to agricultural workers, also testified that attorneys have difficulty accessing their agricultural worker clients to provide immigration and other legal support because employers will turn them away or will demand to be present at attorney-client meetings. *Id.* at 7:19:55 – 7:21:16. Jenifer Rodriguez also testified that she heard similar complaints from healthcare workers who reported that employers would hover or require their representatives to be present at healthcare appointments. *Id.*

Healthcare providers directly support the health and safety of agricultural workers, and legal advocates and government officials help workers with their legal status and enforcing their rights, which also supports the workers' health and safety. Anita Rodriguez testified that S.B. 21-

87 would help to guarantee that workers could access food, healthcare, and people who can tell them their rights, so that the workers would not have to choose between their jobs and their health. Mar. 17, 2021, S. Comm. Hrg., 3:22:30 – 3:22:50.

Clergy and education providers, in their roles as key service providers, also serve the purpose of ensuring the health and safety of agricultural workers. Melanie Kesner, Public Policy Director of the Interfaith Alliance, testified that agricultural workers can be reluctant to access services, including banking, because they are afraid of being detected and targeted by ICE. Mar. 17, 2021, S. Comm. Hrg., Statement of Melanie Kesner, 3:14:22 – 3:16:35. In turn, she testified, workers come to rely on their employers as their primary source of basic goods, which can lead to price gouging. *Id.* She testified, "Many of the clergy who we work with throughout Colorado have unique opportunities to support these vulnerable populations." *Id.* at 3:15:45 – 3:15:55. With regard to education providers, Jenifer Rodriguez testified that she knew of workers who were not allowed to attend English classes on their days off. June 3, 2021, H. Comm Hrg., 7:08:30 – 7:08:39. She was told by the employer that this was "because they didn't come here to learn English." *Id*. Receiving education, in particular learning how to speak English, can help workers become less isolated and less vulnerable, and therefore healthier and safer. By excluding such providers, employers ensure that the workers remain dependent on them.

The evidence presented to the legislature supported the enactment of the key-service-provider provisions as a measure to ensure the health and safety of agricultural workers after decades of unsafe conditions and exploitation. Those agricultural employers who already ensure that their workers have access to key service providers will not face as much of a need for workers to access the providers on the employers' private property. Agricultural employers have

a role in creating the circumstances that necessitate the need for the key-service-provider provisions, by hiring workers to perform extreme and dangerous manual labor and by mandating overtime in remote locations without access to telephone, internet, or transportation.  But, just as an employer could not start a wildfire on private property and then refuse to allow firefighters to put it out, they cannot create extreme, dangerous, and isolated conditions for agricultural workers and then exclude key service providers under protection of the Fifth Amendment. The General Assembly found that working conditions of agriculture workers justify this kind of reasonable access for only key service providers, tailoring the exercise of the police power to the substantial need.

For these reasons the Act's key-service-provider provisions do not give rise to a *per se* taking because they fall into the police power exception recognized in *Cedar Point*. Thus, Plaintiffs are unlikely to succeed on the merits of their claims, and the Court should deny their request for a preliminary injunction.[2]

> **2. The Act is also distinguishable from the regulation in *Cedar Point* because it confers a right to workers to access key service providers, in contrast to the "right to take access" to private property that was conferred by the regulation.**

The regulation challenged by landowners in *Cedar Point* granted unions a "right to take access" to agricultural employers' property in order to solicit support. Here, in service of the legislative purpose of ensuring the health, safety, and welfare of workers, the key-service-

---

[2] Defendants intend the arguments above to apply equally to Plaintiffs' facial and as-applied challenges. The conditional nature of the "right of access" conveyed by the Act renders it facially constitutional. Moreover, because the Plaintiffs have not alleged facts that would render the key-service-provider access compulsory, their as-applied challenges are also unlikely to succeed on the merits.

provider provisions confer a right on agricultural workers to access their key service providers. A key service provider's entry onto an agricultural employer's land is incidental to that right. Accordingly, while the regulation in *Cedar Point* gave union organizers an affirmative right to access private property at specific times and for specific durations, the Act requires agricultural employers to provide access to key service providers however and wherever they choose – prohibiting only those practices that interfere with an agricultural worker's *reasonable access* to key service providers. *Compare Cedar Point,* 141 S. Ct. at 2069 ("Under the regulation, a labor organization may 'take access' to an agricultural employer's property for up to four 30-day periods in one calendar year. . . . [Organizers] may enter the employer's property for up to one hour before work, one hour during the lunch break, and one hour after work."), *with* § 8-13.5-202(1)(b) (providing an "employer shall not interfere with an agricultural worker's reasonable access to key service providers at any location during any time in which the agricultural worker is not performing compensable work or during . . . breaks, and with respect to health-care providers during any time") & § 8-13.5-202(1)(d) (providing an "employer may require visitors accessing a work site to follow protocols designed to manage biohazards and other risks of contamination, to promote food safety, and to reduce the risk of injuries to or from livestock on farms and ranches except on the open range, if the same protocols are generally applied to any other third parties who may have occasion to enter the work site").

Other provisions of the Act highlight the fluid and fact-specific nature of this reasonableness standard. For example, the Act prohibits interference with reasonable access to key service providers "at any location during any time in which the agricultural worker is not performing compensable work."  In other words, the Act suggests that employer discretion is

dependent on circumstances; employers have the least discretion to limit on-site access to key service providers during breaks and off hours since during those times disruption to agricultural operations is least likely. *See* § 8-13.5-202(1)(b). Contrastingly, the Act provides that reasonable access to medical professionals does not depend on "whether or not the agricultural worker is working." *Id.* By singling out medical professionals in this way, the Act recognizes that the bounds of objectively reasonable employer policies will necessarily differ in instances involving medical issues as compared to meetings with other kinds of key service providers.

Because of these distinctions, the Act does not affect a *per se* taking under the *Cedar Point* rule. Further, these distinctions render Plaintiffs unable to demonstrate any likelihood of success on their facial challenge, because Plaintiffs cannot point to any specific instances where they have been or will be compelled to allow key service providers on to private property as a matter of law. As a result, Plaintiffs fail to establish *any* unconstitutional interpretation of the key-service-provider provisions – much less that "no set of circumstances exists under which the Act would be valid." *Grimmett*, 439 at 1271 (internal citations omitted). To Plaintiffs' concern that the statute *could* be construed broadly as conferring a right to service providers to access private agricultural property with reckless disregard to the operations on that property, that concern is tempered by the rule of statutory construction that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the [legislative] intent." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

18

As a result, Plaintiffs are unlikely to succeed on the merits of their claim and are not entitled to preliminary injunctive relief.

### 3. Plaintiffs are unlikely to succeed on the merits because the key-service-provider provisions constitute reasonable conditions exchanged for benefits conferred upon employers.

Additionally, while *Cedar Point* establishes the general rule that rights of access to private property without compensation create Fifth Amendment takings, it also acknowledges that "not every physical invasion is a taking." *Cedar Point*, 141 S.Ct. at 2074-75 (citing *Loretto v. Teleprompter Manhattan CATV Corp*, 458 U.S. 419, 432-35 (1982)). Rather, "the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Id.* at 2079. For this class of exceptions, the *Cedar Point* court implicitly acknowledged that regulations "germane to any benefit provided to agricultural employers or any risk posed to the public" would not constitute *per se* Fifth Amendment Takings.

Any right of entry for key service providers created by the Act functions only as a "condition of receiving certain benefits" that "bear[] an 'essential nexus' and 'rough proportionality' to the impact of the proposed entry." *Cedar Point*, 141 S.Ct. at 2079 (internal citations omitted). For example, the Supreme Court has not found Fifth Amendment takings in laws that allow access to private property for traditional "police power purpose[s] such as routine health and safety inspections." *See Cedar Point,* 141 S. Ct. at 2079-80 (citing several federal statutes that require landowners to allow access for inspections and investigations, as a condition of permits, licenses, or registration, including for pesticide inspections, hydroelectric project investigations, pharmaceutical inspections, and nuclear material inspections). Entry onto private

property for such inspections does not constitute a taking because the entry confers direct and proportional benefits upon employers in the form of both worker and consumer safety, and quality control. Indeed, agricultural employers who participate in the H-2A program are already required to allow unfettered access to their properties for government inspectors and investigators to conduct both announced and unannounced inspections. *See* 29 C.F.R. § 501.15.

Companies with safe workers and products are more likely to keep up with market demands and to produce products that people want to buy. The Supreme Court has held that such benefits are sufficiently related and proportional to the burden placed on employers to defeat a takings claim. *See id.* Consistent with the long-recognized police power exception to the Takings Clause, Colorado law often allows access to private property for health and safety inspections. *See, e.g.*, § 8-20-408, C.R.S. (2022) (authorizing access to inspect liquid petroleum storage tanks); § 9-4-105, C.R.S. (2022) (authorizing access to inspect boilers); § 9-7-104, C.R.S. (2022) (authorizing access to inspect explosives). The state's police power justifies access under acts like these because the public interest in protecting health and safety takes priority over an employer's interest in excluding uninvited guests from private property.

Here, agricultural employers will derive significant and proportional benefits from any instance when key service providers meet with workers on company property. Specifically, they receive the benefits of agricultural workers' labor, which often requires workers to work extensive overtime hours in remote locations and under physically dangerous and exhausting conditions; often these are workers hired through the H-2A program run by the state and federal governments. In exchange for these substantial benefits (without which agricultural work of all kinds would quickly become economically impractical), employers need only allow agricultural

workers to see a doctor, lawyer, or other key service provider on company property when and if failing to do so would amount to unreasonable interference under the circumstances. *See* § 8-13.5-202(1)(b)&(c).

Additionally, agricultural employers benefit from key-service-provider access through increased employee health, wellness, and productivity. Further, key-service-provider access reduces interruptions and disruptions associated with employee absence and attrition because agricultural workers will be less likely to have to choose between mandatory overtime and their own health, safety, and wellbeing. Workers will only perform better when not distracted by the specter of medical, legal, financial, and personal crisis which grows out of an inability to access key service providers.

### 4.  Plaintiffs have no constitutional right to injunctive relief under the Fifth Amendment.

Even if the Court concludes that the key-service-provider provisions effected a taking, Plaintiffs are not entitled to preliminary injunctive relief here. The U.S. Supreme Court has long held that the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power" and that it "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314-15 (1987) (emphasis in original) (citations omitted).

The rule that the remedy for a taking is compensation, rather than injunction, is axiomatic and was recently confirmed in *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019). Prior to *Knick*, a landowner's takings claim was not even ripe for review in federal court until the

landowner had sought compensation. *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985). In *Knick*, the U.S. Supreme Court overruled that case and held that a property owner has an actionable Fifth Amendment takings claim at the time the government takes the property without paying for it. *Knick*, 139 S. Ct. at 2167.

In doing so, the Supreme Court expressly clarified that the *Knick* holding did not mean that injunctive relief would be available to plaintiffs. *Knick*, 139 S. Ct. at 2167-68. The Supreme Court explained that its holding "does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities." *Id.* The court further explained, "Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Id.* at 2176. Further, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id.* And even though a government may violate the Takings Clause when it takes property without compensation, "[t]hat does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation." *Id.* at 2177.

Thus, given the availability of post-taking compensation, "barring the government from acting will ordinarily not be appropriate." *Id.* Finally, the court stated that governments need not fear that the *Knick* holding would lead federal courts to invalidate their regulations as unconstitutional: "As long as just compensation remedies are available—as they have been for

nearly 150 years—injunctive relief will be foreclosed." *Id.* at 2179; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 107 (1974) (reversing a decision enjoining the enforcement of federal statute because the availability of the Tucker Act guaranteed an adequate remedy at law for any taking which might occur); *Hurley v. Kincaid*, 285 U.S. 95, 99 (1932) (rejecting a request to enjoin the carrying out of work on a flood control project because the Tucker Act provided the plaintiff with a plain, adequate, and complete remedy at law).

Colorado has a well-established inverse condemnation process grounded in article II, section 15 of the Colorado Constitution and codified in Colorado statutes. Colo. Const. Art. II, § 15; §§ 38-1-101 – 38-1-122, C.R.S. (2022). In Colorado, an inverse condemnation claim is a special statutory proceeding and is tried as if it were an eminent domain proceeding. *Ossman v. Mountain States Telephone & Telegraph Co.*, 184 Colo. 360, 365-66, 520 P.2d 738, 741-42 (1974). Under § 38-1-101(2), a board of commissioners or a jury determines the amount of compensation while the court determines all other questions and issues. *Linnebur v. Pub. Serv. Co. of Colo.*, 716 P.2d 1120, 1122-23 (Colo. 1986). Plaintiffs do not dispute that they have not sought compensation in this case, and they raise no challenge to the adequacy of Colorado's inverse condemnation process. Thus, consistent with United States Supreme Court precedent, an injunction would not be warranted or appropriate in this case.

**D. Plaintiffs will not experience any irreparable harm without a preliminary injunction.**

Plaintiffs correctly note that the deprivation of a constitutional right constitutes irreparable harm sufficient to justify a preliminary injunction. ECF 13, p. 25 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). However, for the reasons set forth in the preceding sections, the key-service-provider provisions of the Act do not effect an unconstitutional taking. Thus, Plaintiffs cannot establish irreparable harm simply by referring to its language.

Plaintiffs also argue that they will each suffer concrete and irreparable harms should key service providers enter their property. For example, Plaintiffs speculate that key service providers may damage or contaminate crops, interrupt regular operations, be injured by farm equipment, and drive up the cost of operations and insurance. ECF 13, pp. 16-24. But such arguments ignore the broad latitude agricultural employers retain under the Act to "require visitors accessing a work site to follow protocols designed to manage biohazards and other risks of contaminations, to promote food safety, and to reduce the risk of injuries." § 8-13.5-202(1)(d). Indeed, under the Act, agricultural employers are free to impose the same protocols upon key service providers as they would generally impose on "any other third parties who may have occasion to enter the work site." *Id.* As a result, nothing in the Act prohibits agricultural employers from excluding key service providers from, for example, sensitive growing environments, areas where they might encounter dangerous machinery, or other potentially hazardous locations. Further, Plaintiffs do not present any basis to presume that key service providers would not avoid such environments in the first place. Doctors, lawyers, consulate representatives, and clergy generally meet with clients in office settings. Common sense dictates that a worker's meetings with such providers on employee property will take place as far away

24

from active agricultural operations as possible. The harms Plaintiffs speculate about are entirely avoidable if key service providers are allowed to meet with workers in a field office, farmhouse, temporary structure, or on-site employee housing. Ostensibly, these meetings will take place wherever agricultural *employers* typically meet with outside vendors themselves.

Agricultural employers receive visits from equipment manufacturers, agrichemical representatives, irrigation professionals, health and safety inspectors, and others as a matter of routine and without suffering irreparable harm. The only distinguishing factor between such individuals and key service providers is that the former visit is to promote the employer's interests, and the latter visit is to protect workers (which, of course, also benefits their employers over time by making them available to work). That distinction alone does not provide a logical basis to conclude that key service providers are likely to cause any kind of irreparable harm.

### E.  The balance of the equities and the public interest weigh in favor of allowing enforcement of the Act during the pendency of these proceedings.

Lastly, Plaintiffs argue that their allegations of a constitutional violation alone are sufficient to tip the balance of the equities and the public interest in their favor. ECF 13, pp. 26-27. But, again, an analysis under *Cedar Point* demonstrates that the Act does not violate the Takings Clause. As a result, Plaintiffs must demonstrate other equitable and public interest justifications for a preliminary injunction. To that end, Plaintiffs suggest that their alleged injuries provide an equitable basis for a preliminary injunction. ECF 13, p. 28. But, as discussed in the preceding section, Plaintiffs will not suffer irreparable harm merely because of *possible* entry onto their property by key service providers.

By contrast, both the balance of the equities and the public interest weigh heavily in favor of maintaining the status quo and ensuring that agricultural workers can access key service

providers during the pendency of these proceedings. Agricultural workers endure long hours, physically demanding conditions, isolated work environments, and low wages. The Act's key-service-provider provisions do not change any of those realities, but they do provide an essential floor for the treatment of workers. The equities weigh in favor of ensuring that agricultural employers cannot subject their employees to such conditions *and* deny them access to medical care, legal advice, spiritual counsel, and other key services. Notably, the Plaintiffs have not identified any instance of their feared harms actually occurring.

Further, ensuring that agricultural workers can access key service providers promotes the public interest in the broadest sense. Coloradans (and indeed, people all over the world) rely on the agricultural products our state produces for sustenance. Just as agricultural products reach out to every corner of modern society, so too must basic rights protect the most vulnerable workers in our system. The Act represents a step toward a more equitable playing field for all workers. And the public interest dictates that we should not foreclose on that progress absent a compelling equitable justification from the Plaintiffs.

**F.  If the court determines that Plaintiffs are entitled to injunctive relief, the challenged provisions are severable from the remainder of the Act.**

Plaintiffs do not challenge the entire Act. Instead, Plaintiffs only challenge the Act's key-service-provider provisions. *See* ECF 1, p. 3 ¶ 12 ("The specific provisions of C.R.S. § 8-13.5-202(b) and (c) . . . [are] *sic* being challenged in this matter."). Plaintiffs also challenge § 8-13.5-204 "to the extent it authorizes the Colorado Department of Labor and Employment ('CDLE'), through [the Division], to enforce the [key-service-provider provisions] of Section 8-13.5-202(b) and (c)." *Id*. at ¶ 11. Thus, even if the Court ultimately concludes that Plaintiffs are entitled to preliminary injunctive relief, the Court should constrain that relief exclusively to the sections of

26

the Act that Plaintiffs challenge. Under Colorado law, all other provisions of the Act are severable from the challenged provisions and should remain in full force and effect regardless of the outcome of these proceedings.

While the Act does not contain its own severability clause, it is subject to Colorado's general severability statute, which states:

> If any provision of a statute is found . . . unconstitutional, the remaining provisions of the statute are valid, unless . . . the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

§ 2-4-204, C.R.S. (2022).

When applying the severability statute, courts strike as little of an unconstitutional statute as possible, preferring partial invalidation over complete invalidation. *See, e.g.*, *People v. Tate*, 352 P.3d 959, 975 (Colo. 2015) (Rice, C.J., concurring in part and dissenting in part). Partial severance is preferred such that severance may even be limited to a single word or phrase. *Rodriguez v. Schutt*, 914 P.2d 921, 929 (Colo. 1996), *holding modified on other grounds by Sperry v. Field*, 205 P.3d 365 (Colo. 2009). "Thus, severing portions of a statute is preferred over invalidating the entire statute unless the invalid statutory provisions are so 'pervasive or inextricably intertwined with' the valid provisions that severance would render the statute incomplete." *Tate*, 352 P.3d at 975 (Rice, C.J., concurring in part and dissenting in part) (citing *Riverton Produce Co. v. State*, 871 P.2d 1213, 1226 (Colo. 1994)).

27

In deciding whether the invalid statutory provision can stand alone, courts consider two factors: (1) the autonomy of the statutory portions that remain after the defective provisions are excised; and (2) the intent of the enacting legislative body. *Dallman v. Ritter*, 225 P.3d 610, 638 (Colo. 2010); *People ex rel. Tooley v. Seven Thirty-Five E. Colfax, Inc.*, 697 P.2d 348, 371 (Colo. 1985) (noting that a qualified severability clause is used by the judiciary as an aid in determining legislative intent). This two-prong analysis "naturally leads to the third rule—the presumption in favor of severing only specific parts of a law 'is dispelled if what remains is so incomplete or riddled with omissions that it cannot be 'salvag[ed] . . . as a meaningful legislative enactment.'" *Id*. at 639 (internal citations omitted).

In this case, if this Court concludes that a part of the Act should be invalidated, it should sever the precise offending words or phrases in § 8-13.5-202(1)(b) from the rest of that provision and from the other provisions in the Act. Section 8-13.5-202(1)(b) is the only key-service-provider provision that prohibits unreasonable interference with "access to key service providers *at any location*" on Plaintiffs' private property and is the only section that provides the right of access challenged by Plaintiffs. The Court should not, however, strike section 8-13.5-202(1)(c), because this section can stand on its own and does not undermine Plaintiffs' claims. Specifically, §8-13.5-202(1)(c) authorizes rulemaking in connection with employees' access to service providers that do *not* need to be on-site (*i.e.*, off Plaintiffs' property).

The same is true for subsection 202(1)(d), which provides employers with authority to enforce safety rules *if* any service providers are *on-site*; for subsection 202(1)(e), which requires employers to provide transportation to *off-site* services; for section 202(1)(e), which prohibits interference with employee housing; and for subsection 202(3), which requires employers to

provide employees with notice of their rights under the Act. Each of these subsections functions independently of the provisions Plaintiffs challenge, and can stand alone regardless of the outcome of these proceedings.

Finally, severing specific words or phrases from § 8-13.5-202(1)(b) would not render the Act meaningless because the other provisions are not dependent on this provision, and by themselves, offer these workers protections that do not require access onto the Plaintiffs' private properties.

Thus, even if the Court determines that preliminary injunctive relief is warranted here, it should limit such relief exclusively to § 8-13.5-202(b) because it is the only provision that is central to Plaintiffs' claims.

## IV. CONCLUSION

The Act's key-service-provider provisions do not give rise to an unconstitutional taking. Rather, they promote access to key service providers for some of the most disadvantaged and isolated laborers in our economic system while still giving employers broad discretion to implement reasonable policies that take their operational needs into account. The key-service-provider provisions are also justified as an exercise of the state's police powers, as proportional trade-offs for the benefits the Act confers on agricultural employers, and as an authorization of (at most) a mere occasional trespass that does not constitute a taking. For these reasons, Plaintiffs cannot meet their burden of establishing a strong likelihood of success on their constitutional claims, irreparable injury, or an equitable/public interest justification for a preliminary injunction.

29

Should the Court disagree, injunctive relief is still not appropriate here. Rather, Plaintiffs may be entitled to the relief explicitly allowed under the Fifth Amendment: just compensation. Moreover, any relief provided to the Plaintiffs should be narrowly tailored in conformance with Colorado's severability statute.

Respectfully submitted this 21st day of October, 2022.

PHILIP J. WEISER
Attorney General

*/s/ Krista Maher*

John August Lizza
First Assistant Attorney General
Krista Maher
Senior Assistant Attorney General
Christopher K. Boeckx
Assistant Attorney General
Tanya M. Santillan
Assistant Attorney General
Office of the Colorado Attorney General
State Services Section
1300 Broadway, 6th Floor
Denver, CO  80203
Phone Numbers: (720) 508-6158; (720) 508-6184;
(720) 508-6120; (720) 508-6130
E-mails: john.lizza@coag.gov;
krista.maher@coag.gov; chris.boeckx@coag.gov;
tanya.santillan@coag.gov

*Attorneys for Defendants Joseph M. Barela and Scott Moss*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing **RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW** upon all parties herein by e-filing with the CM/ECF system maintained by the court, or by electronic mail, or by depositing copies of same in the United States mail, first-class postage prepaid, at Denver, Colorado, this 21st day of October, 2022, addressed as follows:

Kevin C. Paul                                    Todd Miller
Range PC                                         Miller & Miller, LLC
600 Grant Street, Suite 650                      1301 Arapahoe Street, Suite 105
Denver, CO 80203                                 Golden, CO 80401
kevinpaul@range.law                              todd@millerlawco.com


/s/ *Xan Serocki*
*Original signature on file at the Colorado Attorney General's Office*